**In the Matter of The GUARDIANSHIP OF Jasmine Whitiney NIX, a minor child.**

**Melinda Yvonne NIX, Appellant,**

**v.**

**Glen NIX, Wanda Nix, and George Steven Nix, Appellees.**

**No. 85707.**

Court of Appeals of Oklahoma, Division No. 3.

April 16, 1996.

Scott Hamilton, Legal Services of Eastern Oklahoma, Tulsa, for Appellant.

Sam T. Allen, Sapulpa, for Appellees.

### *OPINION*

HANSEN, Presiding Judge:

Appellant, Melinda Yvonne Nix (Mother), seeks review of the trial court's order deny-

ing her motion to revoke the guardianship of her natural child, Jasmine Whitiney Nix (Child). Mother was divorced from Child's father, Appellee George Steven Nix (Father), in March 1993. Mother and Father agreed at that time to place custody of Child with Father. In October 1993, Appellees Glen and Wanda Nix (Grandparents), paternal grandparents, were appointed co-guardians of Child with Father's consent.

Mother filed her motion to revoke guardianship in January 1994. She had previously filed a motion to modify the divorce decree to grant her custody. In the motion to revoke guardianship, Mother asked that she be given custody of Child, or, alternatively, that she be given specific visitation rights. The trial court consolidated Mother's two motions for hearing. The trial court denied Mother's motion to revoke the guardianship, and found her motion to modify the divorce decree was accordingly moot. Mother brings this appeal from the order denying her motion.

As her single appellate proposition, Mother contends the trial court erred in its determination that Grandparent's guardianship over Child should not be discharged in accordance with 30 O.S.1991 § 4–804. Section 4–804 provides:

> The guardian of an incapacitated or partially incapacitated person or minor may be discharged by the court when it appears to the court, on the application of the ward or otherwise, that the guardianship is no longer necessary.

The Oklahoma Supreme Court has held the guardianship of a minor is *no longer necessary* within the meaning of § 4–804 "when it is shown that the minor's natural parent or parents are fit persons to have their care and custody, and that such custody would be in their best interests". *In re Guardianship of Hatfield*, 493 P.2d 819 (Okla.1972). In *Hatfield*, the Supreme Court adopted the rule from California decisions interpreting a statute similar to § 4–804, citing, among other cases, *In re White's Guardianship*, 84 Cal.App.2d 624, 191 P.2d 466 (1948).

■ In *White*, as in *Hatfield*, the mother was petitioning for termination of a grandmother's guardianship over the mother's natural child. The California Court of Appeals in *White* held termination was authorized, in the trial court's discretion, "upon petition therefor, with adequate proof of the fitness of the parent and the best interest of the child". As the petitioner here, and therefore the proponent of termination, Mother had to establish both her parental fitness and that termination was in the best interest of Child. In our review of the trial court's determination on these issues, we will examine the record, but will not reverse unless that determination is against the clear weight of the evidence. *In re Reid's Estate*, 294 P.2d 544 (Okla.1956).

■ The record reflects the trial court primarily based its denial of Mother's motion on its finding Mother had not established her fitness as a parent. We find no definition of fitness, or unfitness, in relation to the guardianship circumstances here. However, we do find guidance in *McDonald v. Wrigley*, 870 P.2d 777 (Okla.1994), where a paternal grandmother sought custody of her grandchild by intervening in a divorce proceeding. In *McDonald*, at 781, the Supreme Court held that to obtain custody, the grandmother must prove parents' unfitness "by a showing that the parents cannot reasonably be expected to provide for the child's ordinary comfort or intellectual and moral development". That test for unfitness also has relevance under the circumstances here.

■ Although the trial court did not make specific findings in its order, the court, at Mother's request, did recite from the bench some of the factors that led to the unfitness determination. At the first session of the hearing on Mother's motions, held on July 1, 1994, Mother admitted that at the time of divorce, she agreed with Father that he could have custody of Child if he would pay her car payments and give her support alimony of $200.00 a month. At the later session in December 1994, she recanted that testimony, denying a specific agreement. On this, and other matters, the trial court expressed questions about Mother's "veracity under oath".

Mother's veracity was brought into question by her admissions that, when stopped by

police in Kansas she had given them a false name because her license was suspended; that she had applied for food stamps using her maiden name, even though she was still married to Father at the time; and that she had applied for cable television service in Child's name because she had a bill that had not been paid.

The court also questioned Mother's testimony that she had not contested the guardianship because she had no notice. The record shows notice was provided Mother by first class mail. Additionally, Glen Nix testified he personally told Mother on what day the guardianship hearing was going to be held. In attempting to explain her reasons for giving Father custody of Child, Mother stated she did so in hopes they would reconcile. She also testified, however, that she had been dating a Robert Avery before the divorce, that she was having sexual relations with Mr. Avery in April 1993, soon after the divorce, and that she become pregnant by him in early June, 1993. Mother delivered that child, Jessica Avery, in March 1994, but never married Mr. Avery.

Mother's employment record was sporadic, and she had been unemployed since December 1993. She was receiving assistance from the state of Kansas, and was in a state supported course of study but seemed uncertain of the requirements to finish that study. From the time of divorce in March 1993, to the first session of the hearing in July 1994, Mother lived in four different residences, and had moved once again before the December 1994 session.

While each of the foregoing factors would not be individually determinative of Mother's fitness as a parent, in combination they reveal a continued instability casting considerable doubt that Mother could be reasonably expected to provide for Child's intellectual and moral development. *McDonald v. Wrigley,* 870 P.2d at 781. After examination of the record, we do not find the trial court's denial of Mother's motion to terminate guardianship was against the clear weight of the evidence. *In re Reid's Estate,* 294 P.2d at 545. The trial court's order is, accordingly, AFFIRMED.

ADAMS, V.C.J., and BUETTNER, J., concur.